# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| VICTORIA ABRAHAMSON,<br><br>    Plaintiff,<br><br>vs.<br><br>BEN SCHEEVEL, et al.,<br><br>    Defendants. | No. C21-3014-LTS-KEM<br><br>**MEMORANDUM<br>OPINION AND ORDER** |

## I. INTRODUCTION

This case is before me on motions (Docs. 46, 50) for summary judgment by defendants Ben Scheevel, the City of Estherville (the City) and Brent Shatto as to all counts of the plaintiff's state court petition (Doc. 2). Plaintiff Victoria Abrahamson filed a resistance (Doc. 73), and the defendants filed replies (Docs. 76, 77). Oral argument is not necessary. *See* Local Rule 7(c). Trial is set to begin on October 24, 2022.

## II. PROCEDURAL HISTORY

Abrahamson commenced this action on April 9, 2021, by filing a petition (Doc. 2) in the Iowa District Court for Emmet County. On April 30, 2021, Shatto and the City filed a notice (Doc. 1) of removal based on federal question jurisdiction. Scheevel consented to the removal. Doc. 17. Trial is scheduled to begin October 24, 2022.

Abrahamson asserts the following claims:

Count I: Intentional Infliction of Emotional Distress (against Scheevel, Shatto and the City)

Count II: Civil Extortion (against Scheevel and the City)

Count III: Negligent Supervision and Regulation (against the City), and

Counts IV, V and VI: Violations of 42 U.S.C. § 1983 (against Scheevel, Shatto and the City).

### III. RELEVANT FACTS

The City of Estherville hired Ben Scheevel as a part-time police officer in April 2015. Doc. 72-3 at 1. As part of the hiring process, the police department conducted a background check, which included contacting Scheevel's former employers, confirming his Iowa Law Force Academy certification, and conducting fingerprint inquiries. Doc. *Id*. The City promoted Scheevel to a full-time patrol officer in May 2016. *Id*. At some point, Scheevel began assisting Mike Webber with repossessing vehicles for Employees Credit Union (ECU), separate from his employment with the City. *Id*. at 2. This case arises in connection with one of those repossessions.

Victoria Abrahamson purchased a vehicle in 2017 or 2018, which she financed through ECU. Doc. 46-2 at 114. On April 10, 2019, Webber and Scheevel arrived at Abrahamson's residence in Spencer, Iowa, on behalf of the ECU, to repossess her vehicle. *Id*. The following day, Scheevel contacted Abrahamson via Facebook messenger. *Id*. at 4. He wrote

> Scheevel: Thanks for being so cooperative last night. No one has been that nice to us as you were last night. Its a shitty situation for us and you. Sorry about that!
>
> Abrahamson: ??
>
> Abrahamson: Oh ur the repo man!
>
> Scheevel: Haha yea I am one of them

Doc. 46-2 at 4. Between April 11, 2019, and April 15, 2019, Scheevel and Abrahamson exchanged roughly 300 messages. *Id*. at 123. The following excerpts from their conversations are the basis of Abrahamson's claims.[1]

---

[1] Citations indicate a break in conversation. All typos are in the original.

2

Case 3:21-cv-03014-LTS-KEM   Document 79   Filed 08/31/22   Page 2 of 20

**Thursday, April 11, 2019:**

> Scheevel: Haha well we try. Most people don't like us as much as you do. We should look into yelp [laughing emojis]
>
> Abrahamson: Haha it happens there no reason for me to freak on u guys it's not ur fault!
>
> Scheevel: True, but not everyone sees it that way
>
> Abrahamson: I was always taught to be nice expecislly when it's not someone else's fault!
>
> Scheevel: Well you are a special lady that is for sure!
>
> Abrahamson: Awe thanks!
>
> Scheevel: You're welcome
>
> Abrahamson: Thanks! It means a lot!
>
> Scheevel: Well by the sounds of it you deserve someone special that's for sure
>
> Abrahamson: Awe thank you!

*Id.* at 4-7.

> Scheevel: Wish I could help ya get your vehicle back.
>
> Abrahamson: Same lol still trying to figure out how
>
> Scheevel: I suppose I could go write them a check!! [smiley face emojis]
>
> Abrahamson: Life savor totally would rate I on yelp over the chart

*Id.* at 8.

> Scheevel: Traveling nurse would be tough with kids wouldn't it?
>
> Abrahamson: Maybe a lil
>
> Scheevel: I mean I would help ya out but the repayment would be tough I'm sure
>
> Abrahamson: What lol
>
> Scheevel: With payment on your vehicle
>
> Abrahamson: The payment is I believe like 277 a month
>
> Scheevel: Do you have the money to get it back though?
>
> Abrahamson: Not 1300
>
> Scheevel: So if you got it back could you make the payments?

3

> Abrahamson: Yes!
>
> Scheevel: If I would help you out we would need to keep it on the DL.
>
> Abrahamson: Ok.....
>
> Abrahamson: Wait are you implying?
>
> Abrahamson: What*
>
> Scheevel: What do you mean?
>
> Abrahamson: Life if u would help having to keep it on the dl
>
> Scheevel: Well I'm married but its rocky right now
>
> Abrahamson: I cant do that I can be ur friend cause I know a lot of people go through shit
>
> Abrahamson: I'm not that type of person!
>
> Scheevel: Well I would help you out! We have different checking accounts so she wouldn't know!
>
> Scheevel: I didn't figure you were that type of person
>
> Abrahamson: What are u trying to get off this?!
>
> Scheevel: My money back hopefully! [smiling emojis]
>
> Abrahamson: Ohhhh lol
>
> Scheevel: Why what were you thinking I wanted out of it??
>
> Abrahamson: A pizza [laughing emojis]
>
> Scheevel: Haha maybe!! [laughing emojis]
>
> Abrahamson: [laughing emojis]
>
> Scheevel: If I had snapchat I would say a few pictures but don't haha
>
> Abrahamson: Ohh
>
> Scheevel: [smiling emojis] just messing with you
>
> Abrahamson: [laughing emojis]

Doc. 46-2 at 9-13.

> Scheevel: I also gotta say you are the hottest looking one we have ever repoed a car from!
>
> Abrahamson: Haha idk how I was so in comfy clothes and a mess
>
> Scheevel: You were trust me
>
> Abrahamson: Well thank you haha

4

Scheevel: Yeah anytime

*Id.* at 15.

Scheevel: My buddy was gonna try to work out a deal with you last night…[laughing emojis]

Abrahamson: Wat was that lol

Scheevel: You don't wanna know

Abrahamson: I kinda do now

Scheevel: Haha he said for a bj or some booty he would have let you keep it

Abrahamson: Ohhh

Scheevel: Haha what would you have done if he asked??

Abrahamson: Uh no lol

Scheevel: Haha okay

Abrahamson: Lol I'm not like that'

Scheevel: Good to know

Abrahamson: Ya lol

*Id.* at 16-17.

Scheevel: Yeah we got lucky and to top it off got to see a smoking hot woman in the mean time

Abrahamson: Haha

*Id.* at 18.

Scheevel: So are you driving someone else's vehicle now?

Abrahamson: Nope lol

Scheevel: Well shit.. That's no Bueno

Abrahamson: Yes

Scheevel: You want me to leave you alone?

Abrahamson: Well I'll be going to bed soon lol

Scheevel: Oh okay well I can leave you alone

Doc. 46-2 at 20.

5

**Friday, April 12, 2019:**

Scheevel: How would you like me to help get your vehicle back.

Abrahamson: Idk lol I don't ever ask for help

Scheevel: How long would it take for you to pay me back?

Abrahamson: I start my summer job next month but idk if the bank will give me that long to get the money

Scheevel: Call them and explain to them what's going on. Maybe ask for Laurel Hash she will work with you

Abrahamson: I did lol I still have to come up with 1300 to get t back

Abrahamson: That's who I talked to

Scheevel: Oh really… Well damn

Abrahamson: Yes

Scheevel: How would you like me to help?

Abrahamson: Idk haha

Scheevel: Well then haha

Abrahamson: Haha I don't ask for help

Scheevel: Well it sounds like you need it

Abrahamson: Haha yes

Scheevel: The bad thing is I'm in the process of buying a new vehicle right now

Abrahamson: Oh shit

Scheevel: I'm just trying to figure out if I could do both

Abrahamson: U don't have to help me lol idk why u wanna

Scheevel: Because I feel bad

Abrahamson: Don't feel bad lol

Scheevel: Well I do. A nice girl like you and you are in a shitty situation.

Abrahamson: Ya I have been ever since I left my daughters dad cause he was a abusive

Scheevel: My buddy said he would help ya under one condition.. That he gets dirty pics haha

Scheevel: Yeah good ole Levi

6

> Abrahamson: No not him that's my son I haven't been with him for over 5 years
>
> Scheevel: Oh okay my bad
>
> Abrahamson: Yes haha
>
> Scheevel: What do you think about Levi?
>
> Abrahamson: Hahahahaha hahahahaha I should've never got with him
>
> Scheevel: Haha well that doesn't tell me what you think of him... Were you young?
>
> Abrahamson: Yes 16 lol
>
> Scheevel: Is that when you had your son?
>
> Abrahamson: Yes at 17
>
> Scheevel: Wow I can't imagine
>
> Abrahamson: Yes lol
>
> Scheevel: Must have been tough
>
> Abrahamson: Yes lol he's not a bad dad but a bad bf
>
> Abrahamson: Just needs to get his head on straight
>
> Scheevel: Yeah... He hasn't been in trouble with us in awhile. But I have my suspicions
>
> Abrahamson: Haha yes

Doc. 46-2 at 25-30. At some point during this conversation, Abrahamson publicly posted a photo on her Facebook page with the caption, "Kinda felt cute might go steal your dad later…idk." Scheevel privately responded to the post, writing "I'm in haha." *Id.* at 42.

On April 12, 2019, Sergeant Matthew Hellickson of the Estherville Police Department reached out to Shatto via text message after receiving complaints from Abrahamson's family. *Id.* at 90. Hellickson told Shatto that Scheevel had sent inappropriate messages to Abrahamson in the days after he assisted Webber in repossessing her car and urged Shatto to meet with Scheevel. Doc. 46-2 at 90.

When Shatto arrived at his home that night, he was met in his driveway by Kylie Abrahamson, Abramson's stepmother. *Id.* Kylie recounted how Scheevel repossessed Victoria's car and subsequently requested to connect with her on social media. *Id.* at 91.

7

Kylie stated the family was concerned about reporting Scheevel's conduct, as they feared retaliation. *Id*. Further, Scheevel had allegedly driven past Victoria's residence three times that day, which the family found concerning because they believed Scheevel had stalked another woman, Hana Schroeder, and engaged in similar conduct. *Id*. at 91, 118-19. Neither Shatto nor Scheevel had ever received any complaints from Schroeder. *Id*. at 51, 66.

Abrahamson and Shatto dispute the details of this conversation at Shatto's home. Shatto states the Abrahamsons did not want him to act on their allegations but instead wanted the chance to discuss the next step among themselves. *Id*. at 55. Abrahamson denies telling Shatto that she did not want him to act. *Id*. at 117. Further, she claims Shatto told her there were more important things in Estherville for him to attend to, indicating this issue should be "swept under the rug." *Id*. at 117-18. Shatto subsequently left for vacation. Doc. 72-3 at 8.

Over the following weekend, Abrahamson met with Michael Sandy, a local attorney. *Id*. On Monday, April 15, 2019, Sandy met with Estherville City Attorney Jennifer Bennett-Finn, at which time he requested DCI investigate the matter and informed her that Abrahamson would likely file suit. *Id*. Bennett-Finn relayed this conversation to Shatto, who consulted the city administrator and an attorney. *Id*. Shatto then drafted a letter to Scheevel, placing him on administrative leave effective immediately and directing him to avoid contacting the Abrahamson family. Doc. 72-3 at 9. Scheevel's final conversation with Abrahamson took place on April 15, 2019, and went as follows:

    Scheevel: Wanna come work for me
    Abrahamson: No lol
    Scheevel: What are you doing up so early?
    Abrahamson: Nothing lol just woke up
    Scheevel: Why so early?
    Abrahamson: Idk lol

> Scheevel: Haha nice
>
> Abrahamson: Yes lol

Doc. 42-2 at 43.

Shatto completed his investigation on May 1, 2019, and found that Scheevel violated the Department's Computer Security Policy, which stated:

> E. Violations would/could include the following:
>
> Disclosures of driver's license and/or vehicle registration information to an unauthorized recipient.
>
> Accessing driver's license and/or vehicle registration information for personal or non-law enforcement investigative purposes.

Doc. 72-3 at 11-12. Shatto also found Scheevel's actions were inconsistent with written department values and rules as well as its mission statement. *Id.* at 12. Shatto gave Scheevel the option to resign. On May 3, 2019, Scheevel submitted his letter of resignation, effective immediately. *Id.* at 13.

## IV. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could

9

return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

## V. ANALYSIS

### A. Count I: Intentional Infliction of Emotional Distress (all defendants)

Under Iowa law, a plaintiff must prove the following elements to prevail on a claim of intentional[2] infliction of emotional distress:

(1) outrageous conduct by the defendant;

(2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress;

(3) plaintiff suffered severe or extreme emotional distress; and

(4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.

*Barreca v. Nickolas*, 683 N.W.2d 111, 123 (Iowa 2004) (quoting *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997)). Outrageous conduct is conduct that is "so extreme in degree as to go beyond all possible bounds of decency" and is "regarded atrocious, and utterly intolerable in a civilized community." *Id.* "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim, "Outrageous!" *Smith v. Iowa State University of Sci. and Tech.*, 851 N.W.2d 1, 26 (Iowa 2014) (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156-57 (Iowa 1996)). "[I]t is for the court to determine in the first instance, as a matter of law, whether the conduct complained of may reasonably be regarded as outrageous." *Smith*, 851 N.W.2d at 26 (quoting *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 118-19 (Iowa 1984)). "Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.* (quoting Restatement (Second) of Torts § 46, cmt. *h*, at 77 (1965)).

---

[2] *See Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985) (noting that while Iowa cases refer to this claim as an "intentional infliction of emotional distress," neither the Restatement nor Iowa case law requires proof of an intentional act; a "reckless disregard of the probability of causing" emotional distress is enough).

Extreme emotional distress requires a plaintiff to "establish more than the fact that they felt bad for a period of time." *Ette ex rel. Ette v. Linn-Mar Cmty. Sch. Dist.*, 656 N.W.2d 62, 71 (Iowa 2002) (internal quotation marks and citation omitted). There must be "direct evidence of either physical symptoms of the distress or a clear showing of a notably distressful mental reaction caused by the outrageous conduct." *Smith*, 851 N.W.2d at 30 (internal quotation marks and citation omitted). *Compare Northrup v. Miles Homes, Inc. of Iowa*, 204 N.W.2d 850, 855-60 (Iowa 1973) (describing abdominal pains and cramps, losing 40 pounds, receiving medication for her nerves, multiple breakdowns and vomiting in public as sufficient evidence to generate a jury question) *with Pousen v. Russell*, 300 N.W.2d 289, 297 (Iowa 1981) (evidence that plaintiff "was very, very down," "was feeling super badly" and "felt he lost everything" during a month or two-month time period was insufficient evidence of extreme emotional distress). "The law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it." *Tappe v. Iowa Methodist Medical Ctr.*, 477 N.W.2d 396, 404 (Iowa 1991) (internal citations and quotation marks omitted).

Defendants argue there is no evidence Abrahamson suffered from severe emotional distress as a result of their actions. Abrahamson counters that (1) she withdrew from college and (2) she had a "deep concern" after Scheevel allegedly drove past her home several times, both of which she states demonstrate her severe emotional distress. Abrahamson has identified no physical manifestations that she has been under stress. *See* Doc. 46-2 at 120 ("Q: And this stress that you claim that you're suffering, you can't describe to me anything that would indicate you're under stress, can you? A: I don't know."). When asked, she cannot provide examples of how stress affects her or what evidence would show she suffered from a notably distressful reaction. Doc. 46-2 at 114. Abrahamson is not on any medication to treat stress or related conditions, nor did she miss any work as a result of distress from Scheevel's actions. Doc. 46-2 at 114, 121. Abrahamson has sought mental health care for familial issues, depression, and the stress

12

resulting from single parenthood, but these issues are unrelated to any conduct at issue in this case. Doc. 46-2 at 113.

The only evidence Abrahamson cites to demonstrate that she suffered emotional distress is that she ultimately dropped out of her college classes. Doc. 73-1 at 12. She repeatedly attributes this action to the stress from both Scheevel's actions "and everything else," including that she had a baby and her grandmother died. Doc. 46-2 at 120; *see also* Doc. 46-2 at 113 ("Q: Why didn't you finish [your nursing program?] Abrahamson: Personal Reasons. Q: Such as? Abrahamson: I had a baby and my grandma died."). This is not direct evidence of *physical symptoms* related to the distress. Further, it falls far short of the required "clear showing of a notably distressful mental reaction caused by the outrageous conduct."

Viewing the facts in the light most favorable to Abrahamson, no reasonable jury could find she suffered severe or extreme emotional distress, let alone that Scheevel or Shatto caused such an injury.[3] Her intentional infliction of emotional distress claim thus fails as a matter of law.

### B.     *Count II: Civil Extortion (against Scheevel and the City)*

Under Iowa law, a criminal act of extortion gives rise to a civil cause of action for the victim. *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 424 (Iowa 1977). To prevail on a civil extortion claim, a plaintiff must show "(1) an improper threat (2) for the purpose of obtaining for him or another (3) anything of value." *Iowa Supreme Court Attorney Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 13 (Iowa 2012). A person commits extortion if the person threatens to

   a.   inflict physical injury on some person, or to commit any public offense.

---

[3] Defendants also argue that Abrahamson has shown that "outrageous" conduct occurred. Because Abrahamson has not demonstrated that she suffered an injury, I need not address this argument.

13

> b. accuse another of a public offense.
>
> c. expose any person to hatred, contempt, or ridicule.
>
> d. harm the credit or business or professional reputation of any person.
>
> e. take or withhold action as a public officer or employee, or to cause some public official or employee to take or withhold action.
>
> f. testify or provide information or to withhold testimony or information with respect to another's legal claim or defense.
>
> g. wrongfully injure the property of another.

Iowa Code § 711.4. "[A]n extortionate threat is a promise of punishment, of reprisal, or of other distress." *State v. Gant*, 597 N.W.2d 501, 504 (Iowa 1999). It does not need to be explicit and may arise out of innuendo or suggestion. *Gant*, 597 N.W.2d at 504. The threat must be "definite and understandable to a reasonable person of ordinary intelligence." *Gant*, 597 N.W.2d at 504-05. Further, the threat must result in an injury to the plaintiff.

Scheevel argues there is no evidence he threatened Abrahamson. Doc. 50-2 at 2-3. In her petition, Abrahamson alleged that Scheevel:

> a. threatened to accuse Levi Olson of a public offense,
>
> b. threatened to take action against Levi Olson as a law enforcement officer of the EPD and employee of the City of Estherville, and
>
> c. threatened to withhold action in returning the vehicle he impounded as an employee of ECU, a law enforcement officer of the EPD, and employee of the City of Estherville.

Doc. 2 at 10. Olson (the biological father of Abrahamson's children) came up only briefly in Abrahamson's exchange with Scheevel. Scheevel wrote "Yeah good ole Levi" after Abrahamson referenced leaving Olson because he was allegedly abusive during their previous relationship. Doc. 46-2 at 28. Scheevel also asked Abrahamson what she thought of Olson, to which she wrote "[she] should've never got with him." Doc. 26-3 at 29. Finally, Abrahamson told Scheevel that Olson was not a bad father but he "just needs to get his head on straight," and Scheevel replied, "Yeah... He hasn't been in trouble with us in awhile. But I have my suspicions." Doc. 46-2 at 30.

None of these statements constituted an express or implied extortionate threat. Such a threat must be "definite" and "understandable." No reasonable person could find Scheevel threatened to accuse Levi Olson of a public offense or take any other action as a law enforcement officer based on Scheevel's statement that he "has his suspicions" about Olsen. Further, Scheevel did not threaten to withhold action in returning the vehicle. He waffled between whether or not he had the ability to help her, but did not threaten Abrahamson or her property.

As a matter of law, Scheevel did not threaten Abrahamson. As such, her civil extortion claim fails as a matter of law.

### C.   Counts IV, V and VI: Section 1983 Claims (against all defendants)

Abrahamson has brought claims under 42 U.S.C. § 1983 against Scheevel (Count IV), Shatto (Count V) and the City (Count VI). Doc. 2. However, she acknowledges that she failed to specify whether she is suing Scheevel and Shatto in their personal or professional capacities. "[T]o sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." *Johnson v. Outboard Marine Corp.*, 172 F.3d 5312, 535 (8th Cir. 1999). Claims against municipality officials in their official capacities are treated as claims against the municipalities. *Ness v. City of Bloomington*, 11 F.4th 914, 922 (8th Cir. 2021). Therefore, Counts IV and V are dismissed, and the only § 1983 claim that remains is the claim against the City (Count VI). *See King v. City of Crestwood, Missouri,* 899 F.3d 643, 650 (8th Cir. 2018) ( "[A] suit against a government official in only his official capacity should be dismissed as redundant if the employing entity is also named.").

To bring a claim against a municipality under § 1983, "a plaintiff cannot state a claim . . . on a respondeat superior theory, but must instead show that a 'policy or custom' of the municipality caused a constitutional violation." *Ness*, 11 F.4th at 922 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978)). Put differently, to

15

establish a claim against the municipality, a plaintiff must show "(1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise" lead to a constitutional violation. *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018) (internal quotation marks omitted); *see also Whitney v. City of St. Louis,* 887 F.3d 857, 861 (8th Cir. 2018) (stating there can be no municipal liability under § 1983 without a constitutional violation by an agent of the municipality).

Abrahamson argues she suffered from two types of constitutional violations. First, she asserts a "class-of-one" claim under the Equal Protection Clause, alleging Shatto treated her differently from other victims as he investigated her complaints against Scheevel. Doc. 73-1 at 7. Additionally, she asserts Scheevel violated her right to privacy when he accessed her address via a police database and subsequently provided it to Webber. Doc. 73-1 at 9.

### 1. *The Equal Protection Clause*

The Equal Protection Clause provides "No State shall … deny to any persons within its jurisdiction the equal protection of laws." U.S. Const. amend. XIV, § 1. Under the "class-of-one" claim,

> a plaintiff alleges that a defendant intentionally treated [him or her] differently from others who are similarly situated and that no rational basis existed for the difference in treatment. To state a class-of-one claim, the plaintiff must provide a specific and detailed account of the nature of the preferred treatment . . . especially when the state actors exercise broad discretion to balance a number of legitimate considerations.

*Higgins Electric, Inc v. O'Fallon Fire Protection Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016) (internal quotation marks and citations omitted). "To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects." *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015). "A class-of-one plaintiff must therefore provide a specific and detailed account of the nature of the

preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations." *Robbins*, 794 F.3d at 996.

Abrahamson argues "[t]he actions of Chief Shatto on April 12, 2019 in handling Victoria's claim of sexual misconduct by Officer Scheevel are exactly the type of actions which fall within a class-of-one Equal Protection claim." Doc. 73-1 at 7-8. Specifically, she states:

> There is no evidence that Chief Shatto ever took a complainant into his personal kitchen for an interview, and he could not even be bothered to take notes during the interview. Most importantly, Chief Shatto has never asked a sexual harassment victim to re-engage with the accused to act as a quasi-undercover officer . . . It is [discriminatory animus] which permeates throughout Officer Shatto's actions for the next three days – from going home and having to be tracked down by Kylie, to doing nothing when presented with the messages from Officer Scheevel (and in fact encouraging additional communication by directing her to "re-friend" Scheevel), and, finally, to leaving on vacation without following up on any information given to him by the Abrahamsons. Victoria was treated differently than any other victim because of who she was and such treatmeant [sic] was a violation of her right to equal protection under the law.

Doc. 73-1 at 7-8 (internal citations omitted).

The City cannot be liable for the alleged injury under § 1983 based on a theory of respondeat superior, which Abrahamson repeatedly asserts. *See also* Doc. 73-1 at 9 ("Shatto's behavior supports a § 1983 claim against Shatto in his official capacity, and correspondingly, the City."). Therefore, any arguments that attribute liability to the City but are not based on an allegedly discriminatory policy or failure to train and supervise are simply inapplicable. This disposes of nearly all of Abrahamson's arguments.

Further, investigative decisions by police officers are not a basis for class-of-one equal protection claims. *Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794 (8th Cir. 2009) ("[W]e conclude that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim."). This is because investigative decisions require an exercise of discretion, and "[i]t is no proper challenge to what in its nature is a subjective,

individualized decision that it was subjective and individualized." *Flowers*, 558 F.3d 794, 799 (8th Cir. 2009). Even if Shatto's actions are not *per se* the type of investigative decisions referenced in *Flowers*, they are the type of discretionary choices contemplated by *Flowers* and not appropriately the basis of class-of-one claim.

Finally, Abrahamson has not demonstrated she was actually treated any differently than other similarly-situated individuals. "Identifying the disparity in treatment is especially important in class-of-one cases." *Robbins v. Becker*, 794 F.3d 988, 996 (8th Cir. 2015). She provides nothing other than conclusory statements that a community member in a similar position had been treated differently. A class-of-one claim requires a specific and detailed account of the preferred treatment, and Abrahamson has not provided such details. On the record before me, Abrahamson has failed to demonstrate that Shatto treated her differently than anyone else. Even if she could, investigative decisions are not a proper basis for a class-of-one claim. Therefore, no reasonable juror could find for Abrahamson on her class-of-one equal protection claim.[4]

### 2. *Right to Privacy*

Abrahamson argues Scheevel violated her constitutional right to privacy and that the City is liable under § 1983. However, even assuming Abrahamson has a constitutional right to privacy in the information Scheevel disclosed to Webber,[5] she has

---

[4] Abrahamson cites *Murray v. City of Onawa, Iowa*, 323 F.3d 616 (8th Cir. 2003), for the proposition that "[w]hen a city officials [sic] deliberately chooses to ignore allegation of sexual misconduct by one of their police officers and that failure to act is the proximate cause of the victim's mental distress or other psychological injuries, the prerequisite for a § 1983 claim against the official and, consequently, the city employer is satisfied."). Doc. 73-1 at 6. However, the issues in *Murray* related to an unclear jury instruction and attorney fees. It does not establish the premise Abrahamson suggests it does.

[5] The state of the right to informational privacy is unclear, both in the Eighth Circuit and more broadly. *See Dillard v. O'Kelley*, 961 F.3d 1048, 1500 (8th Cir. 2020) ("To the extent [these 8th Circuit cases] recogn[ized] the right to informational privacy, [*National Aeronautics and*

18

not established that the City had a policy or custom that was the "driving force" behind the alleged violation of her privacy. For instance, she states: "In unlawfully accessing the confidential database Officer Scheevel breached his pledge of confidentiality and, in doing so, violated Victoria's right to privacy." Doc. 73-1 at 9. However, Abrahamson does not explain how the City is responsible for these actions through (1) an official municipal policy, (2) an unofficial custom or (3) a deliberately indifferent failure to train or supervise. Her entire argument is:

> Here, Officer Scheevel accessed Victoria's personal information through a confidential law enforcement database "NCIC" which was a violation of Iowa Code Chapter 692. This database includes criminal record history and Officer Scheevel's access included the dissemination of her address to an individual who used the information to repossess her car. In unlawfully accessing the confidential database Officer Scheevel breached his pledge of confidentiality and, in doing so, violated Victoria's right to privacy.

Doc. 73-1 at 9.

Again, Abrahamson seems to rely on a respondeat superior theory, which is not available in § 1983 suits against a municipality. *Ness*, 11 F.4th at 922. She does not dispute that Shatto found Scheevel actually violated department policy when he disseminated her personal information. Doc. 72-3 at 11-12. As a matter of law, the City is not liable under § 1983 based on a violation of Scheevel's right to privacy.[6]

### D. Count III: Negligent Supervision and Regulation (against the City)

Abrahamson argues the City negligently supervised Scheevel. Doc. 2 at 11-12. However, a negligent supervision and retention claim under Iowa law requires the plaintiff show the municipal employee committed a tort or wrongful act that ultimately caused an injury to the plaintiff. *IMT Ins. Co v. Crestmoor Golf Club*, 702 N.W2d 492,

---

*Space Admin v. Nelson*, 562 U.S. 134 (2011)] makes clear they were wrong to do so . . . . and we have not revisited the issue.").

[6] Because no claims remain, I do not address whether Abrahamson may be entitled to punitive damages.

497 (Iowa 2005) (citing *Kiesau v. Bantz*, 686 N.W.2d 164, 172 (Iowa 2004), *overruled on other grounds by Alcala v. Marriott Intern., Inc.*, 880 N.W.2d 699 (Iowa 2016)). Because Abrahamson has not demonstrated a tort or other wrongful act against her that resulted in damages, her negligent supervision and regulation claim against the City necessarily fails as a matter of law.

## VI. CONCLUSION

For the reasons set forth herein,

1. Defendants' motions for summary judgment (Docs. 46, 50) are **granted in their entirety**. All claims asserted against the defendants are hereby **dismissed**.

2. Judgment **shall enter** against the plaintiff and in favor of the defendants.

3. The trial of this case, scheduled to begin on October 24, 2022, is **canceled**.

4. Because this order disposes of all claims, the Clerk of Court shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 31st day of August, 2022.

_____
Leonard T. Strand, Chief Judge